UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CERTAIN UNDERWRITERS at LLOYD'S, LONDON, Subscribing to Policies Numbered 8029663, 8001778, 8071754, 8072492, 8072737, and 8071620,<br><br>Plaintiffs,<br><br>v.<br><br>JEFF PETTIT, an individual,<br><br>Defendant. | Case No. C17-259 RSM<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## I. INTRODUCTION

A bench trial was held in this matter from October 30, 2018, to November 5, 2018, with live testimony and exhibits submitted by both parties. After the presentation of Plaintiffs' evidence, the Court granted a Motion under Rule 52(c) and issued an oral ruling finding against Plaintiffs on their claims of negligence and unseaworthiness. The parties had previously prepared proposed Findings of Fact and Conclusions of Law. Dkt. #77 and #79.

The key issues of law at trial were: 1) whether Defendant was negligent under maritime law in his care and maintenance of the IN DECENT SEAS, and if so, whether his negligence caused the February 21, 2014, fire at Shelter Bay Marina and proximately caused Plaintiff's

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

damages; and 2) whether Defendant owed a duty of seaworthiness under general maritime law to the owners of vessels moored at Shelter Bay Marina, whether he breached that duty, and whether that breach was the proximate cause of Plaintiffs' damages. Dkt. #54 at 3–4. Other issues of law, including calculating prejudgment interest, seeking damages for oil cleanup, and various affirmative defenses, are moot because the Court has found against Plaintiffs on the above claims.

## II. CREDIBILITY OF THE WITNESSES

"In an action tried on the facts without a jury... the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). The trial court is empowered to judge the credibility of the witnesses. *See Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996); *Zivkovic v. S. Cal. Edison Co.*, 105 Fed. Appx. 892, 893 at n.1 (9th Cir. 2004) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)).

The Court specifically finds that the witnesses Xuhua Mu, Richard Stockwell, Jeff Pettit, and John Ueltshi were credible. Their answers during testimony were complete and appeared honest, and their demeanor on the witness stand leads the Court to conclude that they were truthful about what they observed.

## III. FINDINGS OF FACT

The Court incorporates by reference the extensive Stipulation of Facts attached to the Agreed Pretrial Order. *See* Dkt. #54-1. The following additional findings of fact are made by the Court and based upon a preponderance of the evidence presented at trial and the above credibility analysis.

1. Evidence relating to the area of origin of the fire was first presented in the form of photographs and videos taken from various aspects at the scene and eyewitness testimony from persons present at the scene, and records of 911 calls.

2. The parties agree that the earliest photo of the smoke and fire was captured by Gwyneth Beckwith, Exhibit 8, and photo image 00237. The photo show flames and smoke emanating from an area of J dock where the SHEAR JOY was moored at the time of the fire. The IN DECENT SEAS is not directly visible in the photo. The rising smoke indicates the wind is blowing southeast from the location of the flames. Subsequent photos taken by Ms. Beckwith confirm this wind direction.

3. The first individuals to have the best eyewitness view of the fire were Gerald Ziegler, Richard Stockwell, Xuhua Mu and James Dobbs. Of these, the Court reviewed deposition testimony from Mr. Dobbs and live testimony from Xuhua Mu and Richard Stockwell. Mr. Ziegler did not testify in Plaintiffs' case.

4. Ms. Mu initially observed the fire from the north, inside her home, which had a direct view of the boats on the north side of J dock. She also briefly went to J dock to urge Mr. Ziegler and Mr. Stockwell to leave the dock. Ms. Mu observed that the fire was initially limited to the SHEAR JOY. Her later observations of how the fire travelled from boat to boat are not relevant to the Court's determination of liability.

5. Mr. Stockwell ran down to the dock to try and untie the GYPSY DRIFTER, a vessel directly to the east of IN DECENT SEAS. He got within a few yards of the IN DECENT SEAS in an attempt to untie lines. He did not initially see fire on the starboard side of IN DECENT SEAS, the side facing east. Instead a wall of fire was

just west of the IN DECENT SEAS. He observed that the SHEAR JOY, and possibly the port side of IN DECENT SEAS were on fire.

6. Mr. Dobbs came part way down the ramp to J-dock and observed the SHEAR JOY and the IN DECENT SEAS on fire. Nothing on the starboard stern side of IN DECENT SEAS was on fire initially, and he later saw the fire move from the port side to the starboard side.

7. The testimony of each eyewitness closest and earliest to the scene is consistent with that of the other eyewitnesses, and consistent with the earliest photo. Together it is inconsistent with the theory posed by Plaintiffs' expert Paul Way that the shore power inlet on the starboard stern side of INDECENT SEAS was the ignition source of the fire.

8. No evidence was submitted showing that Mr. Pettit stored or used his shore power cord in an unsafe fashion in the period leading up to the fire.

9. Mr. Pettit testified that he last checked on the IN DECENT SEAS in the winter prior to the fire and that it appeared in good working order. He last took the boat out of the marina in June or July of 2013. He always checked the shore power cords when he visited the IN DECENT SEAS. He did not see any issue with the shore power cord or the receptacle on the vessel. There was nothing preventing the IN DECENT SEAS from being able to be taken out to sea prior to the fire.

10. Witness John Ueltschi testified that he would regularly use the IN DECENT SEAS with Mr. Pettit and was in charge of lines and the shore power cord when getting underway and leaving the dock. Having the duty to connect and disconnect the

shore power cord, he would visually observe the connection and never saw anything out of the ordinary. He never observed corrosion, excess heat, or burn marks.

11. Mr. Pettit did not do electrical or mechanical maintenance himself on the IN DECENT SEAS. He hired La Conner Maritime Services for these services. Exhibit 24 demonstrates that his expenses for this maintenance and repair work averaged roughly $9000 per year leading up to the fire. In 2007, records from La Conner Maritime Services indicate that they found "all batteries dead due to burnt shore plug problem" on the IN DECENT SEAS. La Conner Maritime Services replaced the shore power receptacle and power cords. In 2011, records indicate they "found that the shore power inlet on the boat had a very dirty ground connection with very high resistance" and that they "took the shore power inlet apart and cleaned the connections which fixed the high resistance issue." Neither of these previous maintenance issues actually started a fire on the IN DECENT SEAS.

12. Expert testimony from Paul Way established that there was evidence of electric arcing on the male spades of the shore power receptacle recovered from the burnt wreckage of the IN DECENT SEAS. The electrical arcing created a pattern on the recovered spades that would not be caused by an attacking fire. However, Mr. Way was not able to establish conclusively that this arcing was the ignition source of the marina fire at issue in this case. Mr. Way also testified that it was significant that the shore power breaker for the IN DECENT SEAS and GYPSY DRIFTER tripped, but no other shore power breaker tripped. Heat can cause a shore power breaker to trip. Mr. Way could not say what time the trip or arcing occurred.

13. There was no evidence of electrical arcing on the SHEAR JOY, however the shore power receptacle was not recovered from the wreckage.

14. Research presented by Mr. Way indicates that 55% of all fires aboard recreational vessels are electrical in nature, and 11% of those begin in AC shore-power wiring and appliances.

15. The Court heard expert testimony from Arthur Faherty that Chapman's Piloting and Seamanship reference manual recommends annual inspections of a vessel's electrical system by a qualified professional. According to Mr. Faherty, such inspections would reveal any developing high resistance connections in time for them to be repaired. Mr. Faherty was unable to testify as to how common such inspections are among the relevant boating community, and was not able to assert that the SHEAR JOY had such inspections. Mr. Faherty offered other opinions on the standard of care that applied to this case, and steps a reasonable boat owner should have taken in this case, however the Court did not find that testimony convincing or helpful, and it did not establish any new facts.

### IV.  CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and this dispute under maritime law.

2. Establishing negligence under general maritime law requires the plaintiff to "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). A vessel owner owes adjoining slip owners a duty to maintain the electrical equipment on his vessel in "the manner a reasonably prudent

person would under the circumstances." *Galentine v. Estate of Stekervetz*, 273 F.Supp.2d 538, 545 (D. Del. 2003).

3. The Court finds that Plaintiffs' negligence claim under maritime fails for two distinct reasons. First, Plaintiffs failed to establish by a preponderance of the evidence that the fire started on Mr. Pettit's boat, the IN DECENT SEAS. The above discussion of photographic and eyewitness evidence establishes that the fire was first visible on the SHEAR JOY, that the fire was first visible on the IN DECENT SEAS only on the port side, and that the fire was raging while at the same time there was no fire on the starboard stern side of the IN DECENT SEAS. These eyewitness were closest and earliest to the fire; their testimony is more persuasive than any testimony from eyewitnesses further away and later to the scene. This evidence totally contradicts' Plaintiffs theory that the fire started at the starboard stern shore power receptacle of that vessel. Although forensic analysis indicates that there was electrical arcing on the male prongs of the shore power receptacle, this is not dispositive; this kind of arcing could have occurred prior to the date of the fire without causing the fire. Indeed, the maintenance record for this vessel indicates that power cables had been burned and the receptacle previously replaced without a marina fire occurring. While the Court cannot conclude that the arcing on the IN DECENT SEAS shore power receptacle occurred prior to the fire, or that the fire started on the SHEAR JOY, the Court can conclude that such explanations are equally or more likely than the theory proposed by Plaintiffs. Plaintiffs have not met their burden. The cause of the fire remains an unsolved mystery.

4. Second, Plaintiffs' negligence claim fails because they have not proven by a preponderance of the evidence that Mr. Pettit breached the applicable duty of care. Mr.

Pettit trusted the maintenance of his vessel's electrical system to professionals, and performed the repairs recommended by them. He was informed that the high resistance issue for the shore power connection has been "fixed." He never observed anything to the contrary after that repair. Although Mr. Pettit had high resistance issues with this connection twice, in 2007 and 2011, The Court will not find that a reasonably prudent person would have taken some further step to investigate the shore power connection after it had been fixed by a professional the second time. The recommendation from Chapman's to conduct a full annual inspection of a vessel's electrical system is not a required duty under the law. It is speculation that such an inspection would have discovered any issue with the shore power receptacle on the IN DECENT SEAS.

5. A vessel is seaworthy if "reasonably suited for her intended service." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960). To succeed on a claim for unseaworthiness the plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988); *Nelsen v. Research Corp. of Univ. of Hawaii*, 805 F. Supp. 837, 851 (D. Haw. 1992).

6. The Court finds that Plaintiffs' unseaworthiness claim fails as well. As stated above, Plaintiffs have failed to demonstrate by a preponderance of the evidence that any issue on the IN DECENT SEAS caused the Plaintiffs' claimed damages. Furthermore, there was no evidence that the alleged source of the fire, the high resistance shore power connection in 2014, was a condition with the IN DECENT SEAS rather than a single

occurrence, and there was evidence that the IN DECENT SEAS was otherwise capable of being taken out to sea. *See Primozich v. Oczkewicz,* 2017 U.S. Dist. LEXIS 2930, *15, 2017 WL 77518 (W.D. Wash. January 9, 2017) ("Unseaworthiness is a condition, not an individual occurrence").

7. None of the above conclusions of law would be different if the Court considered the materials and testimony of Mr. Way previously reviewed by the Court and excluded by the Court's Order on Motions in Limine (Dkt. #51).

8. Having fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, the Court finds in favor of Defendant Pettit. The clerk shall enter judgment accordingly. Mr. Pettit may separately seek costs under Rule 54(d)(1). This matter is now CLOSED.

DATED this 9th day of November 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE